UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| **Cristian Ramos,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | No. 19 C 5887 |
| v. | ) | |
| | ) | Judge Rebecca R. Pallmeyer |
| **CO Kimberly Harris,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM OPINION AND ORDER

Plaintiff Cristian Ramos filed this civil rights action under 42 U.S.C. § 1983, claiming that the Defendant, Correctional Officer Kimberly Harris, treated him with excessive force when he was a pretrial detainee at the Cook County Jail. Ramos's claim arises from an interaction with Harris that occurred on September 20, 2017, while Harris was escorting Ramos and other detainees across the Jail. Harris has now moved for summary judgment on three alternative theories: (1) Ramos released his claim in an agreement he signed after the episode, (2) Harris's use of force was not objectively unreasonable, and (3) Harris is entitled to qualified immunity.

As explained here, the court concludes that the release defense has been waived, and notes disputes of fact concerning Harris's use of force, but grants Harris's motion on the ground of qualified immunity.

### PROCEDURAL HISTORY

The court previously screened Ramos's complaint, which he filed *pro se*, under 28 U.S.C. § 1915A. In its Order dated October 15, 2019, the court dismissed several defendants without prejudice and narrowed the issues to Ramos's claim that Harris used excessive force during the incident on September 20, 2017 [7]. The scope of the case has remained unchanged since that decision. Following discovery, Harris filed a motion for summary judgment and accompanying papers on May 17, 2021 [39–43, 61]. On September 8, 2021, Ramos filed a consolidated

1

response, which included a response to Harris's statement of facts, a statement of additional facts, a memorandum of law, and several affidavits [60].

## BACKGROUND

### I. The September 20, 2017 Incident

Ramos is an inmate of the Illinois Department of Corrections who is currently incarcerated at Menard Correctional Center. (Def.'s Local Rule 56.1 Statement of Material Facts [39] (hereinafter "Def.'s SOF") ¶¶ 1–2.) As of September 20, 2017, Ramos was a pretrial detainee housed in the Cook County Department of Corrections (the "Jail"). (*Id.* ¶¶ 2, 12–13.) At all relevant times, Harris was employed as a Correctional Sergeant at the Jail. (*Id.* ¶ 3.)

On the morning of September 20, 2017, Harris escorted Ramos and several other detainees from the Jail's library back to their housing unit, or "pod." (*Id.* ¶ 38; Ramos Dep., Ex. B to Def.'s SOF [39-2] 15:13–19, 25:13–17.) Getting from the library to the pod involved walking down a set of stairs, traversing a courtyard, taking an elevator, and crossing through several sets of doors. (Ramos Dep. 18:6–19:4.) The events in question took place during that journey. Although a hallway video camera captured Harris's allegedly excessive use of force (and the moments immediately preceding it), the video has no sound, and the parties dispute the nature of their interaction up to that point.

According to a disciplinary report that Harris filed the same day as her interaction with Ramos, Ramos had begun "verbally sexually harassing" Harris while they were in the elevator with the other detainees. (Def.'s SOF ¶ 39 (citing Ex. F to Def.'s SOF [39-6] (hereinafter "Disciplinary Rpt.") at 1).) Ramos reportedly commented, "[y]ou have some nice titties, I can show you a good time," and told Harris, "Baby you should let me take you out." (*Id.* ¶ 40 (quoting Disciplinary Rpt. at 1).) When Harris advised Ramos that his comments were inappropriate, Ramos reportedly continued to call her "Baby" and said, "Mmmmmm, I want a piece of that ass" as the group exited the elevator. (*Id.* ¶¶ 41–42 (quoting Disciplinary Rpt. at 1).)

2

Ramos vigorously disputes the disciplinary report's characterization of his comments. First, he claims that he initiated conversation with Harris in the elevator only because Harris was berating the group of detainees. (*See* Ramos Dep. 25:18–28–23 ("She was like—she was all like, you guys are stupid; I don't know why you guys get visits; you guys ain't worth shit. Just basically putting us down and just talking to herself.").) As Ramos explains it, he interjected by questioning Harris's basis for such remarks. (*Id.* at 28:15–23 ("I'm like, you don't even—I'm like, you don't even know us.").) He also insists that he would never make the kind of sexually charged comments that Harris reported.[1] (Pl.'s Resp. to Def.'s SOF [60] (hereinafter "Pl.'s SOF Resp.") ¶ 39 ("I don't even use that type of vocabulary in my life to any woman."); *id*. ¶ 40 ("[T]hat's not my type of language at all."); *id.* ¶ 42 ("I would never ever in history say something like that to any female . . . .").) While Ramos has said that he does not remember whether he commented on Harris's breasts, he has noted that if he had done so, he would have used more neutral language. (Def.'s SOF ¶¶ 23–24 ("Q. Did you make any comment about her breasts? A. Not that I remember. But if I—but if I did—but if I did—not that I honestly remember. But if I did, I said— what I would say, you got some nice breasts too, like, just to add that in—just to add that on there." (quoting Ramos Dep. 32:11–27)).)

Whatever its contents or tone, the conversation between Ramos and Harris soon culminated in the scene that was caught on video. (*See* Ex. C. to Def.'s SOF (hereinafter "Security Footage").) The Security Footage shows a small, empty room with two doors, one on

---

[1] Ramos filed several affidavits along with his response brief, at least two of which dispute the language he used when talking with Harris. In her reply, Harris asks the court to disregard those two affidavits under the "sham affidavit" rule. *See James v. Hale*, 959 F.3d 307, 316 (7th Cir. 2020) (explaining that in order to "weed out unfounded claims, specious denials, and sham defenses," a court may ignore "an affidavit that contradicts the party's prior deposition or other sworn testimony" (internal quotation marks omitted)).
Harris reads Ramos's affidavits as "stating he never made sexual comments towards Defendant Harris," a contention that, in Harris's view, contradicts his prior testimony that he may have commented on Harris's breasts. (*See* Def.'s Reply at 1–3.) As the court reads the affidavits, however, they merely dispute Harris's claims about specific language that Ramos used. The affidavits are not flatly inconsistent with any of Ramos's prior testimony, and the court declines to exclude them under the sham affidavit rule.

the right side and one on the left. According to Ramos, the right door opened to the elevator room, while the left door opened toward the pod. (Ramos Dep. 21:1–19.) The group of five detainees (including Ramos) enter the room through the right door, and they are followed by Harris, who closes the door behind her. Moments later, the left door is unlocked (possibly through a buzzer system), and all the detainees except Ramos shuffle through it, out of frame and toward their pod. As Harris goes to close the door behind the detainees, Ramos lingers near her before exiting along with the others. He then appears to initiate conversation and make a slight, upward motion with his right hand, which touches Harris's wrist or arm. Harris says something in response and quickly reaches out her hand, making hard contact with Ramos's upper chest or throat. Ramos stumbles back one step, catches his footing, and then walks backwards toward the pod while continuing to look toward Harris. Harris then shuts the pod door and turns around, exiting the frame through the right door. (*See* Security Footage at 4:30–5:15.)

Ramos's testimony has filled in some of the gaps. For starters, Ramos admits that he intentionally lagged behind the other detainees before exiting through the left door. (Def.'s SOF ¶¶ 21–22.) He admits that he accidentally touched Harris while trying to get her attention. (*Id.* ¶¶ 25–26 ("Q. And what did you do to get her attention? A. I just moved my hand kind of—I think I touched her wrist—her wrist or her sweater or something." (quoting Ramos Dep. 31:24–32:4)); Ramos Dep. 23:20–4 ("Q. So you were gesturing to her? A. Yeah.").) He also admits that he told Harris that she was pretty and that he wanted to take her out on a date. (Def.'s SOF ¶¶ 19–20; Ramos Dep. 29:22–30:10.) According to Ramos, Harris said, "I'm going to punch your ass if you don't get away from me" shortly before she hit him. (Ramos Dep. 29:7–18.)

Ramos insists, however, that he did not attempt to grab Harris's breast. (Def.'s SOF ¶ 43; Pl.'s SOF Resp. ¶ 43; Ramos Dep. 33:3–7 ("So you may have said, you have nice breasts, but you didn't actually attempt to grab her breasts is what you're saying? A. Right. I never—I never intentionally touched them or tried to grab them.").) And he disputes the claim that he said "You know you want this" as he walked backwards after Harris had hit him. (Def.'s SOF ¶ 46; Pl.'s

4

SOF Resp. ¶ 46.) Instead, Ramos says, he told Harris that she had "f***ed up" because he was "going to take [her] out to eat." (Pl.'s SOF Resp. ¶ 46.)

Ramos received medical treatment later that day, but he claims that the nurse who saw him was largely dismissive. (Ramos Dep. 50:20–23, 52:3–16.) While Ramos had no swelling, cuts, or bruising on his chest, and suffered no permanent injury, he says that he had a red mark and that his pain level was "[a]bout a 7 and a half" on a scale of 10. (Id. at 35:19–22, 36:2–7, 53:10–15; see also Def.'s SOF ¶¶ 29–36.)

## II. The Settlement Agreement

Around the time of his altercation with Harris, Ramos entered into two settlement agreements (the "Settlement Agreements") to resolve lawsuits that he had previously filed against other officers at the Jail. (See Ex. E to Def.'s SOF [39-5] (settlement agreements in *Ramos v. Jones*, No. 16 C 2065 (N.D. Ill.), and *Ramos v. Gradowski*, No. 14 C 9458 (N.D. Ill.)).) The Settlement Agreements each contain the following language:

> Plaintiff for himself, his heirs and personal representatives, fully and forever releases, acquits and discharges Defendant, and its agents, employees and former employees, either in their official or individual capacities, from any and all actions, suits, debts, sums of money, accounts and all claims and demands of whatever nature, in law or in equity, including but not limited to any and all claims for Constitutional, federal law or state law violations against Plaintiff, and/or any taken, damaged, disposed of, or destroyed property, and any costs accrued arising out of the allegations made against Cook County and Cook County Sheriff Thomas Dart and any of their employees or former employees which are the subject of *Cristian Ramos v. Bill Jones*, 16 C 2065, *and Cristian Ramos v. Robert Gradowski*, 14 C 9458, in the United States District Court for the Northern District of Illinois, Eastern Division, or any claim or suit which they, their heirs, assigns and legal representatives, may heretofore or hereafter have had by reason of said allegations, including but not limited to any and all claims for Constitutional violations, federal or state law claims, injunctive relief claims, and/or any taken, damaged, disposed of, or destroyed property claims, as well as any other such claims against Cook County, the Cook County Sheriff, Bill Jones, Robert Gradowski or any current or former employees or agents thereof, that may have been brought in connection with any incidents that occurred while Plaintiff was housed in the Cook County Jail at any point prior to the execution date of this Agreement by all parties. THIS IS A GENERAL RELEASE.

(Id. ¶ 7 (*Ramos v. Jones*); id. ¶ 7 (*Ramos v. Gradowski*).) The Settlement Agreements also contain the following statement: "[T]he Parties have executed this Confidential Settlement

Agreement and General Release effective this ___ day of August, 2017." (*Id.* at 5 (*Ramos v. Jones*); *id.* at 5 (*Ramos v. Gradowski*).) The placeholder line was never filled in, but Ramos signed the Settlement Agreements on September 23, 2017 (three days after the altercation giving rise to this case), while the defendants' counsel signed the Settlement Agreements a few weeks later, on October 10, 2017. (*Id.* at 5 (*Ramos v. Jones*); *id.* at 5 (*Ramos v. Gradowski*).)

In his complaint in this case, Ramos duly cited both *Jones* and *Gradowski*. (*See* Compl. [2] § III (listing Ramos's previously filed lawsuits).) In her answer, Harris did not mention *Jones* or *Gradowski*, the Settlement Agreements, or the putative release. (*See* Answer [10].)

## LEGAL STANDARD

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Courts should draw all inferences in favor of the nonmoving party, but a nonmovant is "not entitled to the benefit of inferences that are supported only by speculation or conjecture." *Boss v. Castro*, 816 F.3d 910, 916 (7th Cir. 2016). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, "the nonmoving party must set forth specific facts showing a genuine issue for trial." *Abrego v. Wilkie*, 907 F.3d 1004, 1011–12 (7th Cir. 2018) (citing *Matsushita*, 475 U.S. at 587). "If there is no triable issue of fact on even one essential element of the nonmovant's case, summary judgment is appropriate." *Boss*, 816 F.3d at 916.

## DISCUSSION

### I. Release of Claim

On summary judgment, Harris argues that Ramos released his claim against her when he signed the Settlement Agreements in *Jones* and *Gradowski*. (Def.'s Mot. [41] at 9–11.) "Plaintiff's settlement agreement for both cases, which contains a general release, is clear and

unambiguous. Plaintiff agreed to release Cook County, the Cook County Sheriff, and any agent or employee, including Defendant, from liability for any possible constitutional rights violation he knew about at the time of the execution of the settlement agreements." (*Id.* at 10.) As Harris points out, Ramos apparently signed the Settlement Agreements on September 23, 2017—just three days after his altercation with Harris. (*Id.*) Ramos therefore knew about his possible claim against Harris at the time he executed the release, according to Harris.

In response, Ramos contends that the effective date of the Settlement Agreements (and therefore the release) was several weeks earlier in August 2017. (Pl.'s Resp. SOF ¶ 15; Pl.'s Resp. Br. [60] at 11–12.) According to Ramos, the document took several weeks to reach him for signature only because he was incarcerated. (*Id.*) Harris replies by citing various principles of contract law, including the merger doctrine. (Def.'s Reply [61] at 4–5.)

The court need not wade into this debate. Harris waived the affirmative defense of release by failing to raise it before filing her motion for summary judgment. *See Castro v. Chi. Hous. Auth.*, 360 F.3d 721, 735 (7th Cir. 2004) ("[I]f a defendant does not raise defenses at the time of filing an answer, those defenses are deemed waived." (citing FED. R. CIV. P. 8(c))); FED. R. CIV. P. 8(c)(1) (listing "release" as an affirmative defense). Harris's answer does not even mention the Settlement Agreements, much less suggest that Ramos had released his claims against her. (*See* Answer at 5–6 (pleading four affirmative defenses, none of which is release).) Harris had an ample opportunity to investigate the resolution of Ramos's prior lawsuits, especially given that Ramos properly cited those cases in his *pro se* complaint. In fact, Harris's counsel questioned Ramos about *Jones* and *Gradowski* during his deposition. But Harris never amended her answer to plead this defense, nor has she provided any explanation for her failure to raise the issue sooner. The court therefore concludes that Harris waived the defense of release.

II. **Excessive Force**

Harris also argues that Ramos has not shown that Harris's use of force was objectively unreasonable. The Fourteenth Amendment's Due Process Clause protects pretrial detainees like

7

Ramos from the application of excessive force by government officers. *Forrest v. Prine*, 620 F.3d 739, 743–44 (7th Cir. 2010). Because pretrial detainees are presumed to be innocent, "the punishment model is inappropriate for them." *Miranda v. County of Lake*, 900 F.3d 335, 350–51 (7th Cir. 2018). The Supreme Court has therefore "disapproved the uncritical extension of Eighth Amendment jurisprudence to the pretrial setting." *Id.* at 351 (citing *Kingsley v. Hendrickson*, 576 U.S. 389 (2015)). Under *Kingsley*, a pretrial detainee alleging excessive force need not establish that the officer was subjectively aware that the force being used was unreasonable. Instead, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396.

Determining whether force was objectively unreasonable turns on "the totality of facts and circumstances" in a case. *McCann v. Ogle County*, 909 F.3d 881, 886 (7th Cir. 2018). The court considers factors like "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 396.

On summary judgment, Harris explains that she was "under the impression that Plaintiff was attempting to touch her breast." (Def.'s Mot. at 6.) She also reminds us that she was "alone with Plaintiff with no other officers to assist if the situation escalated." (Def.'s Mot. at 7.) Given those circumstances, Harris insists that she "acted reasonably to protect herself from Plaintiff's unwanted sexual advances and any reasonable officer in Defendant's position would have reacted the same to prevent a pre-trial detainee from assaulting her." (Def.'s Mot. at 7.) Harris contends that she "only used enough force to put distance between her body and Plaintiff." (Def.'s Mot. at 7.) And she notes that "[t]he amount of force [she] used resulted in Plaintiff suffering only *de minimis injury*." (Def.'s Mot. at 7.)

Ramos disputes the idea that Harris reasonably believed there were "sexual advances possibly in play." (Pl.'s Resp. at 1–2.) He admits that he made a hand gesture to get Harris's

8

attention, but insists that the contact itself was both accidental and gentle—and could not reasonably be interpreted as physical provocation. (Pl.'s Resp. at 3–4.) Ramos notes that the video does not resolve the dispute about whether he "made some sort of verbal threat or insult" and that "a correctional officer is not allowed to strike any detainee who says something degrading." (Pl.'s Resp. at 4.) While Ramos agrees that not every use of force by a prison guard is unconstitutional, he also notes that "[e]ven 'one violent push and poke' will constitute excessive force where there is no provocation." *DuFour-Dowell v. Cogger*, 969 F. Supp. 1107, 1120 (N.D. Ill. 1997) (quoting *Lanigan v. Village of East Hazel Crest*, 110 F.3d 467, 475–76 (7th Cir. 1997)).

Determining whether Harris's conduct was unreasonable turns largely on the credibility of the two witnesses. Harris's theory is that the force she applied to Ramos was necessary given her contemporaneous belief that she needed to protect herself from his possible sexual advances. Ramos's account—that Harris made degrading remarks to him and other detainees, that he responded to this abuse by telling her that she was pretty and that he would like to take her on a date, that he may have "added on" a comment about her breasts, and that he finished by making an innocent hand gesture while telling her she "f***ed up" by refusing him—is suspect. The court will nevertheless assume that a reasonable juror could conclude, considering the relevant circumstances identified in *Kingsley*, that the force Harris used—striking Ramos in a potentially sensitive area near his neck—was objectively unreasonable. As explained below, however, Harris is entitled to summary judgment on grounds of qualified immunity.

### III. Qualified Immunity

Qualified immunity shields government officials from liability for civil damages when "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine that an official is protected by qualified immunity, the court asks "first, whether the facts presented, taken in the light most favorable to the plaintiff, describe a violation of a constitutional right; and second, whether the federal right at issue was clearly established at the time of the alleged

violation." *Smith v. Finkley*, 10 F.4th 725, 737 (7th Cir. 2021). "If either inquiry is answered in the negative, the defendant official is protected by qualified immunity." *Koh v. Ustich*, 933 F.3d 836, 844 (7th Cir. 2019).

The court has assumed for this decision that the answer to the first question is yes, and therefore considers whether this right was clearly established at the time of Harris's violation. A constitutional right is clearly established if "the right in question [is] sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Weinmann v. McClone*, 787 F.3d 444, 450 (7th Cir. 2015) (internal quotation marks omitted). A plaintiff can make this showing either "by presenting a closely analogous case that establishes that the Defendants' conduct was unconstitutional or by presenting evidence that the Defendant's conduct was so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender*, 600 F.3d 770, 780 (7th Cir. 2010). Particularly when a plaintiff pursues the first option (i.e., presenting a closely analogous case), the court "must define the right in question with a sufficient degree of particularity." *Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015) (noting in a similar context that "the scope of the right in issue must be drawn more narrowly than the right of a pretrial detainee to be free from excessive force during his detention").

Ramos, who is proceeding *pro se*, has not pointed to any closely analogous cases holding that conduct like Harris's, under similar circumstances, is unconstitutional—nor has he attempted to define his asserted right with any specificity beyond his right to be free from excessive force.[2] Thus Ramos must instead show that Harris's conduct was "so egregious and unreasonable that . . . no reasonable [official] could have thought he was acting lawfully." *Hardeman*, 933 F.3d at 820 (internal quotation marks omitted). Ramos has not made such a showing. As explained

---

[2] That right is, of course, clearly established. *See Kingsley*, 576 U.S. at 396. But the "dispositive question" is "whether the violative nature of *particular* conduct is clearly established." *Hardeman v. Curran*, 933 F.3d 816, 820 (7th Cir. 2019).

10

above, Harris's use of force *may* have been objectively unreasonable; a factfinder would need to make that call. But her conduct was not so obviously unconstitutional that she cannot have believed she was acting lawfully.

Harris was responsible, on her own, for guiding a group of detainees from one part of the Jail to another. Instead of complying with her directions and following the other detainees into their living pod, Ramos opted to linger near her, touch her arm, and make unsolicited, inappropriately flirtatious remarks. To obtain Ramos's compliance and prevent any further advances by him, Harris struck him with a single blow shortly after stating that she would so if Ramos did not back away. That use of force, which was aimed near Ramos's neck, was arguably disproportionate to the needs of the moment, but it was far from egregious, and Ramos suffered little more than temporary pain and a red mark on his skin. "Courts routinely find that simply pushing a noncompliant inmate does not run afoul of the Constitution." *Davis v. Leginza*, No. 16-CV-10763, 2021 WL 1172599, at *4 (N.D. Ill. Mar. 29, 2021); *see also Calhoun v. Wray*, No. 18 C 7551, 2020 WL 4586108, at *4 (N.D. Ill. Aug. 10, 2020) (holding that the defendant acted in an objectively reasonable manner when he "used minimal force to respond to a threat he reasonably perceived, resulting in minimal (if any) injury to" the plaintiff). What happened in this case appeared to be a push, perhaps a harsh one, in response to a noncompliant detainee. The court therefore concludes that Harris is protected by qualified immunity even if a factfinder were to determine that her use of force was objectively unreasonable.

## CONCLUSION

Harris's motion for summary judgment is granted.

ENTER:

Dated: December 30, 2021

_____
REBECCA R. PALLMEYER
United States District Judge